1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

8

## SOUTHERN DISTRICT OF CALIFORNIA

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| | |
|---|---|
| THERESA JONES, individually and as Executrix of the Estate of LANDON JONES, decease; ANTHONY JONES, a minor by and through his parent, THERESA JONES; HUNTER JONES, a minor by and through his parent, THERESA JONES; CHRISTINA GIBSON; individually and as Executrix of the Estate of JONATHAN GIBSON, decease; MAKAYLIN GIBSON, a minor by and through her parent, CHRISTINA GIBSON; ALEXANDER GIBSON, a minor by and through his parent, CHRISTINA GIBSON, | CASE NO. 15cv2087-WQH-RBB<br><br>ORDER |
| Plaintiff, | |
| v. | |
| UNITED STATES DEPARTMENT OF THE NAVY; UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; PRUDENTIAL INSURANCE COMPNAY OF AMERICA, a New Jersey Corporation; GIBBS & COX, INC., a New York Corporation; BATH IRON WORKS CORPORATION, a Maine Corporation; HUNTINGTON INGALLS INDUSTRIES, INC., a Delaware Corporation; and JANA VAVASSEUR, an individual, | |
| Defendant. | |

26

HAYES, Judge:

27

The matters before the Court are: (1) the motions to dismiss filed by Defendants

28

Prudential Insurance Company of America ("Prudential") (ECF No. 17), Huntington

Ingalls Inc. ("Huntington") (ECF No. 18), Gibbs & Cox ("Gibbs") (ECF No. 21), Bath Iron Works Corporation ("Bath") (ECF No. 22), the United States ("U.S.") and the United States Department of the Navy ("Navy") (ECF No. 27); and (2) Huntington's Ex Parte Motion for Leave to File Notice of Supplemental Authority in Support of its Motion to Dismiss (ECF No. 46).

**I. Background**

On September 18, 2015, Plaintiffs commenced this action seeking damages for the deaths of Anthony Jones and Jonathan Gibson. (ECF No. 1). On November 12, 2015, Plaintiffs filed a first amended complaint ("FAC"). (ECF No. 9).

On January 12, 2016, motions to dismiss were filed by Prudential (ECF No. 17), Huntington (ECF No. 18), Gibbs (ECF No. 21), and Bath (ECF No. 22). On January 14, 2016, Bath filed a joinder to Huntington's motion to dismiss. (ECF No. 25). On January 15, 2016, Gibbs filed a joinder to the motions to dismiss filed by Huntington and Bath. (ECF No. 29). On January 15, 2012, the U.S. and the Navy filed a Motion to Dismiss. (ECF No. 27).

On February 2, 2016, Plaintiffs filed a response in opposition to the Motions to Dismiss filed by the U.S. and the Navy (ECF No. 34), Prudential (ECF No. 35), and Huntington, Gibbs, and Bath (ECF No. 36).

On February 8, 2016, Prudential filed a reply. (ECF No. 38). On February 8, 2016, the U.S. and the Navy also filed a reply. (ECF No. 39). On February 9, 2016, replies were filed by Bath (ECF No. 40), Gibbs (ECF No. 41), and Huntington (ECF No. 42).

On April 7, 2016, Huntington filed an Ex Parte Motion for Leave to File Notice of Supplemental Authority in Support of its Motion to Dismiss. (ECF No. 46). On April 7, 2016, Bath filed a Notice of Joinder in Huntington's Ex Parte Motion. (ECF No. 47). On April 8, 2016, Gibbs filed a Notice of Joinder in Huntington's Ex Parte Motion. (ECF No. 48). On April 15, 2016, Plaintiffs filed a response in opposition. (ECF No. 51).

1   On May 25, 2016, the Court heard oral arguments on the motions.

2   **II. Allegations in the Complaint**

3   Plaintiffs allege four causes of action: (1) negligence as to Defendant the U.S.;

4   (2) strict product liability (design defect) as to Defendants Gibbs and Bath; (3) strict

5   product liability (failure to warn) as to Defendant Huntington; (4) violation of 38 U.S.C.

6   § 1967 *et seq*., negligent failure to notify as to Defendants the Navy and Prudential.

7   (ECF No. 9).

8   On September 22, 2013, Lieutenant Commander Landon Jones ("Jones") and

9   Chief Warrant Officer 3 Jonathan Gibson ("Gibson") "died and were forever lost at sea

10  . . . when their MH-60S helicopter, callsign 'INDIAN 617,' was forced off the side of

11  the [USS William P.] LAWRENCE under the command of Vavasseur ('Vavasseur')

12  after being hit by a wave of water during negligent ship maneuvering." *Id*. at ¶ 22.

13  Gibbs "designed the original Arleigh Burke Class Destroyer" and Bath "was the

14  lead design agent for the follow-on modification not the Arleigh Burke Class Destroyer.

15  . . ." *Id*. at ¶ 23. "Both variations of the Arleigh Burke Class Destroyers suffered from

16  a defect known as low-freeboard that unreasonably and unnecessarily endangered

17  aircraft and aircrew operating on its flight decks." *Id*. Huntington "manufactured the

18  LAWRENCE" for the Navy and "[a]s its manufacturer, Huntington knew or reasonably

19  should have known that LAWRENCE had the low-freeboard design defect but

20  nevertheless did not adequately provide warnings of this dangerous defect to users of

21  the LAWRENCE, including but not limited to Jones and Gibson." *Id*.

22  "The freeboard is the distance between the waterline and the flightdeck." *Id*. at

23  ¶ 24. "The smaller or lower the freeboard, the closer the flight deck is to the water."

24  *Id*. "[A]ircrew and flightdeck crews on low freeboard ships are more vulnerable to

25  waves washing over the flightdeck and injuring or killing them, or damaging equipment

26  and aircraft." *Id*.

27  On September 22, 2013, the sea conditions experienced by the LAWRENCE

28  "were reasonably foreseeable during normal operating conditions." *Id*. On that day,

"the LAWRENCE was conducting operations in the Red Sea and was scheduled to recover INDIAN 617 in order to receive flu vaccines from another ship." *Id*. at ¶ 25. "The plan was for INDIAN 617 to make a quick drop off of the flu vaccines, pick up three LAWRENCE sailors and some equipment, and then depart, so that the LAWRENCE could quickly rendezvous with USS NIMITZ." *Id*. "[T]he LAWRENCE was not ready for flight quarters to receive INDIAN 617 and was falling behind." *Id*.

"At 12:25 p.m. local time, INDIAN 617 finally received flight conditions and requested to land, but the LAWRENCE waved INDIAN 617 off when the winds changed." *Id*. at ¶ 26.

"According to the Naval Air Training and Operating Procedures Standardization ('NATOPS'), NAVY's standard operating procedures for flight operations, the ship must maneuver itself to ensure that it is within safe parameters such that the ship's pitch, roll and winds across the deck allow a helicopter to safely land aboard the ship." *Id*. at ¶ 27.

"Once the ship is within a safe envelope to recover a helicopter, the commanding officer orders 'green deck,' which locks the ship in the safe course and speed until the helicopter has landed." *Id*. at ¶ 28. "Once the helicopter has landed, flightdeck crew rushes out to the helicopter and secures it to the ship with chocks and chains." *Id*. "Chocks are heavy rubber wedges placed on both the front and back of the helicopter wheels." *Id*. "Chains are attached from the helicopter to the ship's flight deck." *Id*.

"According to Navy procedure, once the helicopter is chocked and chained, the commanding officer can set 'red deck,' which allows the ship to maneuver freely so long as due caution is taken." *Id*. at ¶ 29. "During 'red deck,' the helicopter's rotors may still be spinning while the helicopter shuts down and flight deck crew may still remain on the weatherdeck of the ship (the weatherdeck is the deck on a ship that has no overhead protection from the weather)." *Id*.

"After INDIAN 617's first aborted attempt to land, the LAWRENCE commanding officer, Vavasseur, conferred with [the] bridge team to maneuver the

LAWRENCE in order to land INDIAN 617." *Id*. at ¶ 30. "Vavasseur ordered a speed of 30 knots in the same direction as the wind which reduced the relative wind felt on the ship." *Id*. at ¶ 31. Vavasseur "was in a hurry to meet up with the NIMITZ. . . . " *Id*.

"The sea conditions consisted of waves six feet high with winds gusting from 20 to 30 knots." *Id*. at ¶ 32. "[W]itnesses noted that the wake of the LAWRENCE was nearly at the level of the flight deck even without excessive ship motion." *Id*. "[A]s a ship moves at higher speed it sinks deeper into the water, further decreasing the height from the waterline to the flight deck." *Id*. "NAVY engineers estimate that the freeboard of the LAWRENCE was only seven feet high when the fatal wave struck INDIAN 617." *Id*.

"After INDIAN 617 had landed but before it could take off again, Vavasseur ordered maximum speed and turned the ship to a southerly course that put the seas on the ship's aft port quarter (waves coming from the aft (back) part of the ship and from the port (left) side)." *Id*. at ¶ 33. "This course and high speed combination caused the ship to roll dramatically from side to side with the pilots Jones and Gibson still strapped inside INDIAN 617 waiting to take off." *Id*. "The LAWRENCE began to experience an unstable motion -- a motion where the bow and stern of the ship move left and right and the ship rides and up and down the waves -- and she started to roll heavily in the swells, eventually experiencing a 12-degree roll." *Id*. "A 12-degree roll can cause personnel to lose footing and is a danger when the ship's safety nets are down." *Id*. at ¶ 34. "The nets are normally up and surround the flight deck to prevent personnel on deck from falling overboard." *Id*. "During flight operations, the nets come down to allow the helicopter to land on the flight deck." *Id*. "NAVY standard operating procedure is to clear the decks of personnel when the ship is experiencing 12-degree rolls." *Id*.

"Vavasseur then ordered the LAWRENCE to turn another five degrees to the right, using two degrees of rudder." *Id*. at ¶ 35. "This last command caused the ship

1  to roll 13 degrees to the port and then 17 degrees to starboard." *Id*. "When the

2  LAWRENCE began to roll, INDIAN 617's crew chief was helping an airman load two

3  250-pound aircraft jacks into the helicopter." *Id*. at ¶ 36. "The crew chief fell to the

4  flight deck and the jacks fells on his leg, crushing it." *Id*. "As the ship dangerously

5  rolled port and starboard, INDIAN 617 began to buckle on the flight deck." *Id*. at ¶ 37.

6  "The chains strained to hold INDIAN 617 to the rolling ship." *Id*. "Its main rotor

7  blades and tail rotor were still spinning." *Id*.

8     "The fatal wave struck INDIAN 617's tail rotor assembly, disintegrating it,

9  causing the helicopter to tip over." *Id*. at ¶ 38. "When INDIAN 617 tipped over, its

10 main rotor blades struck the LAWRENCE's flightdeck causing the helicopter to

11 violently vibrate and tear itself from its chains." *Id*. "Without a tail rotor to stabilize

12 the spinning overhead main rotor, the now-unchained helicopter began to spin

13 chaotically on the flight deck." *Id*. "The ship rolled one more time and INDIAN 617,

14 with Landon Jones and Jonathan Gibson trapped inside, slid off the side of the ship into

15 the Red Sea . . . ." *Id*. at ¶ 39. The bodies of the pilots were not recovered. *Id*. at ¶ 40.

16    "Between 1983 and the LAWRENCE incident, at least 13 Hazard Reports – a

17 NAVY safety reporting process - were written about waves damaging helicopters and

18 flight deck nets aboard low-freeboard destroyers and frigates." *Id*. at ¶ 41. "[M]any

19 Navy personnel reported that rolling and waves caused damage to these flight decks."

20 *Id*. "[B]etween January 2003 and March 2013 . . . the NAVY documented at least nine

21 mishaps involving waves washing over destroyer flight decks." *Id*.

22    "[T]he NAVY never published quantified parameters for reasonable and safe ship

23 handling to prevent future occurrences of this well-documented hazard." *Id*. at ¶ 42.

24 "The NAVY published no guidance beyond merely using 'caution' when maneuvering

25 with a spinning helicopter on deck." *Id*. "NAVY Surface Warfare Officer training on

26 flight operations is focused solely on creating a safe flight envelope for launch and

27 recovery, but had no other restrictions on what to do after the recovery of aircraft." *Id*.

28 at ¶ 43.

"Pilots who are strapped into their helicopter while the main rotor blades are spinning are particularly vulnerable on the Flight IIA destroyers, which have a history of waves coming over the flight deck." *Id* at ¶ 44.

When Mrs. Jones "sought to collect the $400,000 in life insurance . . . [the] NAVY told her that her husband had cancelled" the Servicemembers' Group Life Insurance ("SGLI") coverage "not once but on five different occasions." *Id.* at ¶ 46. "Based on the NAVY's assertion that Mrs. Jones was not entitled to life insurance proceeds, PRUDENTIAL's Office of Servicemembers Group Life Insurance denied her claim and continues to deny it to this day." *Id.* "[U]nder the SGLIA, the Secretary of the Navy is required to notify the beneficiary spouse in writing when the servicemember declines SGLI coverage . . . ." *Id.* at ¶ 47. "Officials with both the NAVY and PRUDENTIAL told Mrs. Jones that despite the fact that the NAVY failed to notify her that her husband had declined life insurance coverage, her husband's cancellation of the SGLI nevertheless remained in effect and that she would not receive the $400,000." *Id.* at ¶ 48.

"With respect to PRUDENTIAL, the Veteran's Administration ('VA') contracted with PRUDENTIAL to serve as the VA's primary insurer under the SGLIA and to operate under VA supervision for the benefit of servicemembers." *Id.* at ¶ 49. "The SGLIA authorizes the VA to purchase coverage from one or more qualified commercial insurers instead of offering coverage by the VA itself." *Id.* "Under the SGLIA, the VA is the policyholder." *Id.* "Defendant NAVY acts on behalf of policyholder VA to maintain appropriate records related to SGLI coverage for each member of the service and NAVY is responsible to use its records to certify coverage for the servicemember at the time of death." *Id.* "PRUDENTIAL received – and continues to receive - subsidies from the United States Federal Government to provide SGLI coverage." *Id.* at ¶ 50. "[D]espite receiving large federal subsidies to insure servicemembers for service-related tragedies just like the one that befell Landon Jones, PRUDENTIAL has refused to provide the $400,000 in life insurance proceeds to his widow

1    **III. Discussion**

2      **A. Standard of Review**

3       Federal Rule of Civil Procedure 12(b)(6) permits dismissal for "failure to state

4 a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Federal Rule of

5 Civil Procedure 8(a) provides that "[a] pleading that states a claim for relief must

6 contain ... a short and plain statement of the claim showing that the pleader is entitled

7 to relief." Fed. R. Civ. P. 8(a)(2). "A district court's dismissal for failure to state a

8 claim under Federal Rule of Civil Procedure 12(b)(6) is proper if there is a 'lack of a

9 cognizable legal theory or the absence of sufficient facts alleged under a cognizable

10 legal theory.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011)

11 (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).

12       "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'

13 requires more than labels and conclusions, and a formulaic recitation of the elements

14 of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

15 (quoting Fed. R. Civ. P. 8(a)). "To survive a motion to dismiss, a complaint must

16 contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

17 plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*,

18 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual

19 content that allows the court to draw the reasonable inference that the defendant is liable

20 for the misconduct alleged." *Id.* (citation omitted). "[T]he tenet that a court must

21 accept as true all of the allegations contained in a complaint is inapplicable to legal

22 conclusions. Threadbare recitals of the elements of a cause of action, supported by

23 mere conclusory statements, do not suffice." *Id.* (citation omitted). "When there are

24 well-pleaded factual allegations, a court should assume their veracity and then

25 determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. "In

26 sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content,

27 and reasonable inferences from that content, must be plausibly suggestive of a claim

28 entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir.

2009) (quotations and citation omitted).

### B. Motion to Dismiss filed by Prudential (ECF No. 17)

Prudential moves to dismiss Plaintiff's[1] fourth cause of action for violation of Servicemembers' Group Life Insurance Act ("SGLIA"), 38 USC §§ 1965 *et seq*., with prejudice for failure to state a claim up which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 17). Prudential contends that Plaintiff's claim must be dismissed because Jones declined life insurance coverage under SGLI and Prudential had no obligation to notify Mrs. Jones of her husband's declination of the coverage.

Plaintiff Theresa Jones contends that Prudential "had a duty" to notify her when her husband declined life insurance coverage under the SGLI. (ECF No. 35). Plaintiff contends that she is entitled to bring this action against Prudential because she had a right to be notified that her husband had declined life insurance and did not receive notification. Plaintiff contends that denying her the right to be notified would "negate" the statutory requirements of the SGLIA. *Id*. at 5-6. Plaintiff requests leave of the Court to amend her FAC if the Court grants the motion to dismiss.

The SGLIA, 38 USC §§ 1965 *et seq*., requires that,

> If a member who is married and who is eligible for insurance under this section makes an election under subsection (a)(2)(A) not to be insured under this subchapter, the Secretary concerned shall notify the member's spouse, in writing, of that election.

38 U.S.C. 1967(f)(1). The Secretary must make a "good faith effort" to notify the spouse of such an election. 38 U.S.C. 1967(f)(4). The SGLIA also directs the "Secretary concerned" to notify the servicemember's spouse in the event the servicemember designates a person other than the spouse or child as a beneficiary. 38 U.S.C. § 1967(f)(3). The SGLIA states that "[f]ailure to provide a notification required under this subsection in a timely manner does not affect the validity of any election .

---

[1] Plaintiff Theresa Jones is the only plaintiff bringing a claim for relief against Prudential.

1    . . of beneficiary designation." 38 U.S.C. § 1967(f)(4).

2         In this case, Plaintiff concedes in her FAC that "under the SGLIA, the Secretary

3    of the Navy is required to notify the beneficiary spouse in writing when the

4    servicemember declines SGLI coverage . . . ." (ECF No. 9 at ¶ 47). Plaintiff does not

5    cite any statute, regulation, or case law that would require Prudential to notify a person

6    of his or her spouse's declination of SGLI coverage. Plaintiff also fails to cite any

7    authority that would make Prudential liable when a spouse fails to receive notice of a

8    servicemember's declination. Under the SGLIA, "the Secretary" is required to notify

9    the beneficiary spouse. Prudential is not "the Secretary." The Court concludes that

10   Plaintiff has failed to state a claim upon which relief can be granted against Prudential.

11        In general, leave to amend is freely granted. *See Foman v. Davis*, 371 U.S. 178

12   (1962). However, allowing Plaintiff to amend its claim against Prudential would be

13   futile. *See Gompper v. VISX*, 298 F.3d 893, 898 (9th Cir. 2002) (complaints should

14   only be dismissed without leave to amend where it is clear that the complaint cannot be

15   saved by any amendment). Plaintiff's fourth cause of action as to Prudential is

16   dismissed without leave to amend.

17        **C. Motions to Dismiss filed by Huntington (ECF No. 18), Gibbs (ECF No.**

18        **21), and Bath(ECF No. 22)**

19        In separate motions to dismiss, Defendants Huntington, Gibbs, and Bath move

20   to dismiss Plaintiffs' second and third causes of action for product liability because

21   those claims are preempted by the Death on the High Seas Act ("DOHSA"), 46 U.S.C.

22   § 30301, *et seq*. (ECF Nos. 18-1 at 7, 21-1 at 11, 22-1 at 8).[2] Plaintiffs "concede that

23   the Death on the High Seas Act . . . is likely the proper statute under which to litigate

24   this case." (ECF No. 36 at 8). Plaintiffs request "leave to amend their FAC to allege

25   DOHSA causes of action." *Id*.

26        DOHSA provides a federal statutory remedy for wrongful death occurring at sea:

27   _____

28        [2] Defendants contend that Plaintiffs' FAC should be dismissed for several other
     reasons. The Court finds it unnecessary to address these arguments at this time.

> When the death of an individual is caused by wrongful act, neglect, or default occurring on the high seas beyond 3 nautical miles from the shore of the United States, the personal representative of the decedent may bring a civil action in admiralty against the person or vessel responsible. The action shall be for the exclusive benefit of the decedent's spouse, parent, child, or dependent relative.

46 U.S.C. § 30302.  In this case, Plaintiffs do not plead a cause of action under DOHSA in their FAC.  Plaintiffs conceded that DOHSA is "the proper statute under which to litigate this case." (ECF No. 36 at 8).  The Court grants the motions to dismiss filed by Defendants.  *See also*, *Helman v. Alcoa Global Fasteners, Inc.*, 637 F.3d 986, 988 (9th Cir. 2011) (holding that the plaintiffs' claims were preempted by DOHSA).

Defendants request that their motions to dismiss be granted without leave to amend because any amendment would be futile.  (ECF Nos. 18-1 at 7, 21-1 at 6, 22-1 at 5, 21-1).  Plaintiffs request that the Court grant leave to amend the FAC.  Any request for leave to amend shall be filed as a Motion for Leave to File an Amended Complaint.

### D. Motion to Dismiss filed by the U.S. and the Navy (ECF No. 27)

Defendants the U.S. and the Navy move to dismiss Plaintiffs' first cause of action for negligence for lack of subject matter jurisdiction because *Feres v. United States*, 340 U.S. 135, 143,(1950), ("*Feres* doctrine")  prohibits suits against the military and military personnel for injuries arising out of or in the course of activity "incident to service." (ECF No. 27-1 at 23).  The U.S. and the Navy also contend that amendment of the FAC in order to remedy DOHSA issues would not cure the *Feres* bar and therefore the Court should dismiss Plaintiffs' first cause of action without leave to amend.

Plaintiffs contend that their case should be allowed to proceed despite the *Feres* doctrine. (ECF No. 34 at 7).  Plaintiffs concede that none of the exceptions to the *Feres* doctrine "are analogous to or stand for the same proposition Plaintiffs proffer here, but rather highlight the ever-increasing criticism of the *Feres* doctrine and courts' willingness to make exceptions to [the *Feres* doctrine] where justice would so demand."

1    *Id*. at 11.  Plaintiffs suggest that the Court make an exception in this case because

2    [h]olding the Navy responsible for its conduct in this case does not
     implicate command decisions, a judicially-created shield that so often
3    prevents a remedy to servicemembers harmed by military negligence. And
     indeed providing an exception to Feres here (or overruling it entirely) will
4    likely improve military discipline because it will act as an incentive to the
     Navy to operate more responsibly and safely which will save lives, money,
5    equipment and materiel. Two sailors are gone and without fixing that
     which killed them, more could certainly follow. And this would be the
6    greatest injustice of all…more preventable deaths.

7    *Id*. at 18.

8        The *Feres* doctrine prohibits suits against the military and military personnel for

9    injuries arising out of or in the course of activity "incident to service." 340 U.S. at 146;

10   *see e.g., United States v. Johnson*, 481 U.S. 681 (1987) (holding that the *Feres* doctrine

11   barred an action on behalf of a helicopter pilot who died during a rescue mission on

12   high seas because it was an activity incident to his military service even if the alleged

13   negligence was by a civilian employee); *Charland v. U.S.*, 615 F.2d 508 (9th Cir. 1980)

14   (dismissing a wrongful death action involving the death of a Navy seaman who died

15   while on leave on the Colorado River during voluntary participation in Navy training

16   exercises).

17       In this case, Plaintiffs allege in their FAC that the decedents were on active duty

18   and were performing duties incident to their military service at the time of their deaths.

19   (ECF No. 9 at ¶ 25). Plaintiffs acknowledge that this case "would not seem to fit any

20   of the current *Feres* exceptions . . . ." (ECF No. 9 at 4). The Court concludes that the

21   government's liability is precluded by the *Feres* doctrine and that any attempted

22   amendment would be futile. The Motion to Dismiss filed by the United States and the

23   Navy is granted with prejudice.

24   **IV. Conclusion**

25       IT IS HEREBY ORDERED that the motion to dismiss filed by Prudential (ECF

26   No. 17) is granted with prejudice.

27       IT IS FURTHER ORDERED that the motion to dismiss filed by the U.S. and the

28

1   Navy (ECF No. 27) is granted with prejudice.

2          IT IS FURTHER ORDERED that the motions to dismiss filed by Huntington

3   (ECF No. 18), Gibbs (ECF No. 21) and Bath (ECF No. 22) are granted without

4   prejudice.

5          IT IS FURTHER ORDERED that the ex parte motion filed by Huntington (ECF

6   No. 46) is denied as moot.

7          IT IS FURTHER ORDERED that any Motion for Leave to File an Amended

8   Complaint shall be filed by June 14, 2016.  Any responses shall be filed by June 28,

9   2016.  Any replies shall be filed by July 5, 2016.

10  DATED:  May 27, 2016

11  

12  **WILLIAM Q. HAYES**
    United States District Judge

13  

14  

15  

16  

17  

18  

19  

20  

21  

22  

23  

24  

25  

26  

27  

28